UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF WEST VIRGINIA
Charleston

FILED
APR 21 2011
TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

United States of America,
    Plaintiff,

v                                         Civil Action No. 2:11-cv-0101
                                              Judge John T. Copenhaver

$27, 671.50, more or less
in United States Currency,
(actually a financial instrument
WesBanco Account xxxx3002)

(Katherine Anne Hoover MD and
John F. Tomasic, interested parties;
No pending federal criminal charges)

## RESPONSE TO THE MOTIONS FILED BY AUSA BETTY PULLIN
## ON APRIL 8, 2011 DOCKET NUMBERS 18, 19 AND 20

      NOW COME John F. Tomasic and Katherine A. Hoover MD, pro se, to refute the argument for reasonable cause for the search and seizure warrants in 2:10-mj-35, 2:10-mj-29, Civil Action No. 2:10-cv-1087 and Civil Action No. 2:11-cv-0101. John F. Tomasic and Katherine A. Hoover MD agree with AUSA Betty Pullin that the Court should Order the return of $27,671.50, but contest the remainder of that pleading. The need for a hearing is moot because AUSA Pullin has all ready demonstrated her lies in the pleadings that she has filed.

      The warrants issued relied on affidavits produced in conjunction with a long investigation done by federal agents Lafferty, Smith and others into the medical practice at 35 West Third Ave. Williamson, WV. from 2005 until March 2, 2010. The practice was owned by Dr. Ryckman and Dr. Katherine Hoover and Dr. Victor Teleron worked as independent contractors. During that period of time agents or informants invaded the practice by seeking medical care for ailments they did not have. In fact, they signed a document verifying that they needed the medications that were prescribed for them. This investigation was done under the guise that they had subject matter jurisdiction, when they did not have subject matter jurisdiction. These are states' rights issues and the federal government lacks authority over the practice of medicine. This violated West Virginia statute Article 4 S 60-4-410 regarding being truthful with a doctor.

All of the federal agents acting in this investigation and the subsequent raid on the clinic lacked even the most minimal knowledge or expertise about the practice of medicine, therefore it was impossible for them to determine whether or not anything was done illegally. The agents and AUSA Monica Schwartz lacked knowledge about the extreme danger to patients when a clinic is shutdown without notice and all of the patients were publicly categorized in official press releases by the United States Attorney's office as being drug addicts when in reality they were pain patients.

The effect of the press release against the patients had a dramatic effect on all of the patients. The patients were unable to find alternative medical care by area doctors and were forced to travel out of state to obtain medications to treat chronic and acute pain or to buy pain medications on the street making them unwilling victims of the Justice Department. The illegal drug trade now flourishes in Williamson, WV thanks to the efforts of Magistrate Judge Mary Stanley, federal agents and AUSAs Pullin and Schwartz. Upon information and belief, thirty-two patients have died due to lack of medical care.

Congress has made it very clear in its statutes the process by which the practice of medicine will be handled. This is very concise in Title 21 USC 801(a)(3)(C). The only avenue for any allegation to be brought against a doctor practicing the art of medicine is through these avenues: the community of doctors' consensus with the approval of the Secretary of Health and Human Services. This is to prevent the awful tragedy that this unlawful investigation and raid has produced.

WHEREFORE the Certificate for Reasonable Cause should be denied. The Request for a Hearing should be denied. The Motion to Dismiss by AUSA Pullin should be Granted as far as the return of the $27,671.50 but the claims regarding illegal money should be struck. Damages and costs of $7500.00 should be GRANTED to John F. Tomasic and Katherine A. Hoover MD. Further, Katherine A. Hoover MD and John F. Tomasic urge the Court to discipline AUSA Pullin and FBI agent James Lafferty for perjury as previously requested.

Respectfully submitted,

*John F. Tomasic*
John F. Tomasic

*Katherine A. Hoover MD*
Katherine A. Hoover MD

## CERTIFICATE OF SERVICE

    I, Katherine A. Hoover MD, do hereby certify that a true and correct copy of the foregoing RESPONSE TO THE MOTIONS FILED BY AUSA BETTY PULLIN ON APRIL 8, 2011 DOCKET NUMBERS 18, 19 AND 20 has been sent by Fed-ex to AUSA for the Southern District of West Virginia 300 Virginia St. East Suite 4000 Charleston, WV 25301 on April 18, 2011.


*Katherine A. Hoover MD* (signature)

Katherine A. Hoover MD
c/o Dr. Norman Gay
N-3222
West Bay Medical Clinic
West Bay St.
Nassau, N.P., Bahamas
242-525-4018

*Read pages 18, 19 and 20 completely*

546 U.S. 243, 126 S.Ct. 904, 163 L.Ed.2d 748, 74 USLW 4068, 06 Cal. Daily Op. Serv. 433, 2006 Daily Journal D.A.R. 608, 19 Fla. L. Weekly Fed. S 49

Briefs and Other Related Documents
Judges and Attorneys
Oral Argument Transcripts with Streaming Media

Supreme Court of the United States
Alberto R. **GONZALES**, Attorney General, et al., Petitioners,
v.
**OREGON** et al.

No. 04-623.
Argued Oct. 5, 2005.
Decided Jan. 17, 2006.

**Background:** State of Oregon and others brought action seeking declaratory and injunctive relief preventing federal enforcement or application of United States Attorney General's interpretive rule indicating that physicians who assist suicide of terminally ill patients pursuant to Oregon Death With Dignity Act (ODWDA) would be violating the federal Controlled Substances Act (CSA). The United States District Court for the District of Oregon, Robert E. Jones, J., 192 F.Supp.2d 1077, permanently enjoined enforcement of the rule. The United States Court of Appeals for the Ninth Circuit, 368 F.3d 1118, granted petitions for review and held the rule invalid. Government's petition for certiorari was granted.

**Holdings:** The Supreme Court, Justice Kennedy, held that:
(1) interpretive rule was not entitled to deference as interpretation of allegedly ambiguous regulation;
(2) rule was not entitled to *Chevron* deference; and
(3) CSA did not authorize Attorney General to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide, as authorized by ODWDA.

Affirmed.

Justice Scalia filed dissenting opinion in which Chief Justice Roberts and Justice Thomas joined.

Justice Thomas filed dissenting opinion.

West Headnotes

[1] KeyCite Citing References for this Headnote

15A Administrative Law and Procedure
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(C) Rules and Regulations
         15Ak412 Construction
            15Ak413 k. Administrative Construction. Most Cited Cases

15A Administrative Law and Procedure KeyCite Citing References for this Headnote
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(C) Rules and Regulations

expertness, its fit with prior interpretations, and any other *269 sources of weight"). The deference here is tempered by the Attorney General's lack of expertise in this area and the apparent absence of any consultation with anyone outside the Department of Justice who might aid in a reasoned judgment. In any event, under *Skidmore,* we follow an agency's rule only to the extent it is persuasive, see *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); and for the reasons given and for further reasons set out below, we do not find the Attorney General's opinion persuasive.

### III

[10] As we have noted before, the CSA "repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs." *Raich,* 545 U.S., at 12, 125 S.Ct., at 2203. In doing so, Congress sought to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Ibid.* It comes as little surprise, then, that we have not considered the extent to which the CSA regulates medical practice beyond prohibiting a doctor from acting as a drug " 'pusher' " instead of a physician. *Moore,* 423 U.S., at 143, 96 S.Ct. 335. In *Moore,* we addressed a situation in which a doctor "sold drugs, not for legitimate purposes, but primarily for the profits to be derived therefrom." *Id.,* at 135, 96 S.Ct. 335 (quoting H.R.Rep. No. 91-1444, pt. 1, at 10, U.S.Code Cong. & Admin.News 1970, pp. 4566, 4576; internal quotation marks omitted). There the defendant, who had engaged in large-scale overprescribing of methadone, "concede[d] in his brief that he did not observe generally accepted medical practices." 423 U.S., at 126, 96 S.Ct. 335. And in *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), Congress' express determination that marijuana had no accepted medical use foreclosed any argument about statutory coverage of drugs available by a doctor's prescription.

[11] [12] In deciding whether the CSA can be read as prohibiting physician-assisted suicide, we look to the statute's text and **923 design. The statute and our case law amply support the *270 conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood. Beyond this, however, the statute manifests no intent to regulate the practice of medicine generally. The silence is understandable given the structure and limitations of federalism, which allow the States " 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.' " *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)).

The structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States' police powers. The Attorney General can register a physician to dispense controlled substances "if the applicant is authorized to dispense ... controlled substances under the laws of the State in which he practices." 21 U.S.C. § 823(f). When considering whether to revoke a physician's registration, the Attorney General looks not just to violations of federal drug laws; but he "shall" also consider "[t]he recommendation of the appropriate State licensing board or professional disciplinary authority" and the registrant's compliance with state and local drug laws. *Ibid.* The very definition of a "practitioner" eligible to prescribe includes physicians "licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices" to dispense controlled substances. § 802(21). Further cautioning against the conclusion that the CSA effectively displaces the States' general regulation of medical practice is the Act's pre-emption provision, which indicates that, absent a positive conflict, none of the Act's provisions should be "construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates ... to the exclusion of any State law on the same subject matter*271 which would otherwise be within the authority of the State." § 903.

Oregon's regime is an example of the state regulation of medical practice that the CSA presupposes. Rather than simply decriminalizing assisted suicide, ODWDA limits its exercise to the attending physicians of terminally ill patients, physicians who must be licensed by Oregon's Board of Medical Examiners. Ore.Rev.Stat. §§ 127.815, 127.800(10) (2003). The statute gives attending physicians a central role, requiring them to provide prognoses and prescriptions, give information

about palliative alternatives and counseling, and ensure patients are competent and act voluntarily. § 127.815. Any eligible patient must also get a second opinion from another registered physician, § 127.820, and the statute's safeguards require physicians to keep and submit to inspection detailed records of their actions, §§ 127.855, 127.865.

[13] Even though regulation of health and safety is "primarily, and historically, a matter of local concern," *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), there is no question that the Federal Government can set uniform national standards in these areas. See *Raich, supra,* at 9, 125 S.Ct., at 2201. In connection to the CSA, however, we find only one area in which Congress set general, uniform standards of medical practice. Title I of the Comprehensive Drug Abuse Prevention and Control Act of 1970, of which the CSA was Title II, provides:

**\*\*924** "[The Secretary], after consultation with the Attorney General and with national organizations representative of persons with knowledge and experience in the treatment of narcotic addicts, shall determine the appropriate methods of professional practice in the medical treatment of the narcotic addiction of various classes of narcotic addicts, and shall report thereon from time to time to the Congress." § 4, 84 Stat. 1241, codified at 42 U.S.C. § 290bb-2a.

**\*272** This provision strengthens the understanding of the CSA as a statute combating recreational drug abuse, and also indicates that when Congress wants to regulate medical practice in the given scheme, it does so by explicit language in the statute.

In the face of the CSA's silence on the practice of medicine generally and its recognition of state regulation of the medical profession it is difficult to defend the Attorney General's declaration that the statute impliedly criminalizes physician-assisted suicide. This difficulty is compounded by the CSA's consistent delegation of medical judgments to the Secretary and its otherwise careful allocation of powers for enforcing the limited objects of the CSA. See Part II-B, *supra.* The Government's attempt to meet this challenge rests, for the most part, on the CSA's requirement that every Schedule II drug be dispensed pursuant to a "written prescription of a practitioner." 21 U.S.C. § 829(a). A prescription, the Government argues, necessarily implies that the substance is being made available to a patient for a legitimate medical purpose. The statute, in this view, requires an anterior judgment about the term "medical" or "medicine." The Government contends ordinary usage of these words ineluctably refers to a healing or curative art, which by these terms cannot embrace the intentional hastening of a patient's death. It also points to the teachings of Hippocrates, the positions of prominent medical organizations, the Federal Government, and the judgment of the 49 States that have not legalized physician-assisted suicide as further support for the proposition that the practice is not legitimate medicine. See Brief for Petitioners 22-24; Memorandum from Office of Legal Counsel to Attorney General, App. to Pet. for Cert. 124a-130a.

[14] On its own, this understanding of medicine's boundaries is at least reasonable. The primary problem with the Government's argument, however, is its assumption that the CSA **\*273** impliedly authorizes an Executive officer to bar a use simply because it may be inconsistent with one reasonable understanding of medical practice. Viewed alone, the prescription requirement may support such an understanding, but statutes "should not be read as a series of unrelated and isolated provisions." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The CSA's substantive provisions and their arrangement undermine this assertion of an expansive federal authority to regulate medicine.

The statutory criteria for deciding what substances are controlled, determinations which are central to the Act, consistently connect the undefined term "drug abuse" with addiction or abnormal effects on the nervous system. When the Attorney General schedules drugs, he must consider a substance's psychic or physiological dependence liability. 21 U.S.C. § 811(c)(7). To classify a substance in Schedules II through V, the Attorney General must find abuse of the drug leads to psychological or physical dependence. § 812(b). Indeed, the differentiation of Schedules II through V turns in large part on a substance's habit-forming potential: The more addictive a substance, the stricter the controls. **\*\*925** *Ibid.* When Congress wanted to extend the CSA's regulation to substances not

obviously habit forming or psychotropic, moreover, it relied not on executive ingenuity, but rather on specific legislation. See § 1902(a) of the Anabolic Steroids Control Act of 1990, 104 Stat. 4851 (placing anabolic steroids in Schedule III).

The statutory scheme with which the CSA is intertwined further confirms a more limited understanding of the prescription requirement. When the Secretary considers Food and Drug Administration approval of a substance with "stimulant, depressant, or hallucinogenic effect," he must forward the information to the Attorney General for possible scheduling. Shedding light on Congress' understanding of drug abuse, this requirement appears under the heading "Abuse *274 potential." 21 U.S.C. § 811(f). Similarly, when Congress prepared to implement the Convention on Psychotropic Substances, it did so through the CSA. § 801a.

[15] The Interpretive Rule rests on a reading of the prescription requirement that is persuasive only to the extent one scrutinizes the provision without the illumination of the rest of the statute. See Massachusetts v. Morash, 490 U.S. 107, 114-115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989). Viewed in its context, the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse. As a corollary, the provision also bars doctors from peddling to patients who crave the drugs for those prohibited uses. See Moore, 423 U.S., at 135, 143, 96 S.Ct. 335. To read prescriptions for assisted suicide as constituting "drug abuse" under the CSA is discordant with the phrase's consistent use throughout the statute, not to mention its ordinary meaning.

The Government's interpretation of the prescription requirement also fails under the objection that the Attorney General is an unlikely recipient of such broad authority, given the Secretary's primacy in shaping medical policy under the CSA, and the statute's otherwise careful allocation of decisionmaking powers. Just as the conventions of expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power. It is unnecessary even to consider the application of clear statement requirements, see, e.g., United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); cf. BFP v. Resolution Trust Corporation, 511 U.S. 531, 544-546, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), or presumptions against pre-emption, see, e.g., Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 387, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), to reach this commonsense conclusion. For all these reasons, we conclude the CSA's prescription requirement does not authorize*275 the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.

IV

The Government, in the end, maintains that the prescription requirement delegates to a single executive officer the power to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice in every locality. The text and structure of the CSA show that Congress did not have this far-reaching intent to alter the federal-state balance and the congressional role in maintaining it.

**926 The judgment of the Court of Appeals is

*Affirmed.*

Justice SCALIA, with whom Chief Justice ROBERTS and Justice THOMAS join, dissenting.

The Court concludes that the Attorney General lacked authority to declare assisted suicide illicit under the Controlled Substances Act (CSA), because the CSA is concerned only with " *illicit* drug dealing and trafficking," *ante,* at 923 (emphasis added). This question-begging conclusion is obscured by a flurry of arguments that distort the statute and disregard settled principles of our interpretive jurisprudence.

Contrary to the Court's analysis, this case involves not one but *three* independently sufficient grounds for reversing the Ninth Circuit's judgment. First, the Attorney General's interpretation of

**FedEx International Air Waybill**

Date: 04/18/11

Sender:
Katherine Hoover 242-525-4018
C/o Dr. Norman Gay
West Bay Med. Clinic
West Bay St.
Nassau, N.P.
Bahamas

Recipient:
Clerk 304-347-3000
USDC SDWV
300 Virginia St. E.
Suite 2400
Charleston, WV
US 25301

Tracking #: 875470548072

Description: Doc

Barcode: 653905 MLAX 04/18 50AG3/26A8/1BC2

A2 PRIORITY 25301 HTS